## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **EARNEST EUGENE PADILLOW,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 18-CV-122-TCK-CDL** |
| | ) | |
| **SCOTT CROW,** | ) | |
| *Interim Director,* | ) | |
| *Oklahoma Department of Corrections* | ) | |
| | ) | |
| **Respondent.** | ) | |

## <u>OPINION AND ORDER</u>

This matter comes before the Court on a Petition for Writ of Habeas Corpus filed pursuant to 28 U.S.C. § 2254.  Petitioner Earnest Eugene Padillow ("Padillow") is a prisoner proceeding *pro se*.  He is currently in the custody of the Oklahoma Department of Corrections and confined in the North Fork Correctional Center in Sayre, Oklahoma.  He challenges his convictions for rape in the first degree (Count 1) and rape by instrumentation (Counts 2 and 3), all offenses committed after a previous felony conviction in Case No. CF-2010-3621, and two additional counts of rape in the first degree (Counts 1 and 2) also committed after a previous felony conviction in Case No. CF-2011-3957.  Both cases were tried in a consolidated trial in the District Court of Tulsa County, Oklahoma.  For the reasons discussed below, the Petition for Writ of Habeas Corpus is **DENIED**.

Padillow filed the instant Petition for Writ of Habeas Corpus (Dkt. 1) on February 26, 2018, challenging his convictions and sentences as in violation of federal law on the following grounds:

I.     Padillow's appellate counsel was ineffective because counsel did not raise issues suggested by Padillow on appeal;

II.     Padillow's trial counsel was ineffective for failing to obtain and introduce a video of a victim's medical examination;

III.    Padillow's trial counsel was ineffective for failing to locate and call witness Regina Johnson;

IV.     The trial court erred in denying Padillow's *pro se* motion to dismiss trial counsel;

V.      Padillow's trial counsel was ineffective for failing to object to the admission of "crucial" evidence against him;

VI.     The trial court improperly denied Padillow's request for an evidentiary hearing on his application for post-conviction relief ("PCR");

VII.    The trial court erred in removing Padillow from the courtroom during closing arguments in violation of the confrontation clause; and

VIII.   The trial court denied Padillow's right to testify.

## FACTUAL BACKGROUND

In ruling on Padillow's direct appeal, the Oklahoma Court of Criminal Appeals ("OCCA") set forth a detailed statement of the facts of the case, which we adopt.[1]

> In August of 2007, Padillow sexually abused his nine-year-old great-niece, S.G. Over the course of a single day, he took her to another child's birthday party, followed her into the bathroom, and put his penis in her vagina. S.G. asked unsuccessfully for another ride home. Padillow then took her to his house. While he took a shower, she tried to leave. Padillow stopped her. When S.G. asked to go home, he had her lay on his bed to watch a movie, rubbed her buttocks, then put his finger in her vagina. S.G. again asked to go home. Padillow warned her not to tell anyone and took her home; on the way, Padillow rubbed S.G.'s arms and legs and she wet her pants. Padillow brought a pair of pajamas with them to S.G.'s house. Her mother told her to take a bath and put them on. The pajama pants had a hole in the crotch. While S.G., Padillow, her mother and her sister lay on the floor, and her mom and sister fell asleep, Padillow put his finger in S.G.'s vagina again. S.G. told her mother that Padillow touched her. The allegations were not reported to police until about a year later, but S.G. was too emotionally fragile to cooperate. The investigation was halted until, in 2010, Padillow's twelve-year-old cousin D.S. claimed that Padillow sexually abused her.

---

[1] "In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1).

[FN 1: "The charge involving D.S. was dismissed, and D.S.'s testimony was properly admitted as propensity evidence under 12 O.S. 2011, § 2414. Padillow does not complain about this evidence.]

In August 2011, Padillow babysat his niece, 11-year-old D.P., and her siblings. While D.P. was on the couch, Padillow sat down beside her, lifted a blanket which was over her, and put his finger in her vagina. He told her that if she told anyone he wouldn't love her anymore. In September 2011, Padillow visited D.P.'s house, saying they'd get something to eat. He took her to his house. D.P. said her stomach hurt and she felt sick. Padillow told her to go lay down in the back bedroom. He came in, began to take off her clothes, and told her he wouldn't hurt her. Using lubricant, he put his penis in her vagina, ejaculated, and told her to clean herself up. Padillow asked D.P. to promise not to tell anyone if he bought her supper, but when she got home she told her sisters. She tried to tell her mother, but Padillow, who had come in with D.P., followed them throughout the house. Finally D.P.'s sister told her mother they needed to go to the hospital because Padillow did something to D.P. As they tried to leave, D.P. heard Padillow ask them to try and work it out, saying he didn't want to go to jail for the rest of his life. Padillow could not be excluded as a contributor to DNA found on external genital and anal swabs from D.P., and a fluid testing presumptively positive for seminal fluid was on the external genitalia swabs and on D.P.'s underpants.

The record shows Padillow had a contentious relationship with his attorneys from the very beginning—no matter who they were. His cases were filed separately. Padillow was originally charged with abusing D.S. and S.G. in CF-2010-3621, and represented by an attorney from the Tulsa County Public Defender office. He bonded out of jail, committed the offenses against D.P., the second case was filed, and he was represented by a different attorney from the Tulsa County Public Defender office in the second case. Padillow expressed dissatisfaction with both those lawyers. At least one other Public Defender Office attorney was involved in the case. After several discussions, and an incident one of his attorneys witnessed, in which Padillow committed an action resulting in a misdemeanor charge against him, the trial court removed the Tulsa County Public Defender Office and appointed conflict counsel, Stephen Lee and Mark Cagle. The record reflects Padillow's relationship with these two included at least one profane outburst and one assault during pretrial conferences. Padillow finally informed the trial court that he could not agree with defense counsel's trial strategy, and insisted on representing himself. Padillow began the trial representing himself with standby counsel Lee and Cagle. However, he asked that Lee and Cagle be re-appointed to represent him during voir dire, after the State had passed the panel for cause and Padillow had begun questioning the panel. The trial court granted this request.

Before the state rested Padillow offered the trial court a handwritten motion to dismiss his counsel, claiming that Cagle and Lee were ineffective. This motion was

denied, the State rested, Padillow called his first witness, and there was a lunch break. Padillow had expressed his intention to testify. After lunch and before jurors returned, his attorneys made a record that Padillow would not cooperate in preparing his trial testimony and wanted to represent himself. Padillow explained that he wanted to recall particular witnesses who had either already testified, been subject to cross-examination, and released by counsel, and that defense counsel had not subpoenaed any of the proposed witnesses. The jurors returned and Lee called Padillow to the stand. In front of the jury, Padillow got up as if to walk to the stand but instead attacked Cagle, jumping on him violently. Padillow also tried to attack Lee. The attack broke chairs at the defense table. Lee and the deputies separated Padillow from Cagle. Deputies subdued Padillow and removed him from the courtroom through the main entrance.

The trial court made a record, in front of the jury, that Padillow's actions constituted a knowing and voluntary waiver of his right to be present and his right to testify. The defense rested, and the jury retired. Outside the jury's presence the trial court gave a fuller description of the attack. The trial court stated that it was clear that the attack had an impact on the jury, but that having watched the incident and the jury, the court believed the incident would not impact the trial. The court noted that jurors did not become emotional, cry, or even gasp. Based on these observations, the trial court did not grant a mistrial. Lee continued to represent Padillow, making zealous and thorough closing arguments. Neither Lee nor the prosecutor mentioned the courtroom attack in closing.

Dkt. 16-3, pp. 2-5.

## PROCEDURAL BACKGROUND

After closing arguments made by counsel (but without Padillow present), the jury rendered guilty verdicts on all counts for rape in the first degree (Count 1) and rape by instrumentation (Counts 2 and 3), all offenses committed after a previous felony in Case No. CF-2010-3621, and the two additional counts of rape in the first degree (Counts 1 and 2) also committed after a previous felony conviction in Case No. CF-2011-3957. In Case No. CF-2010-3621, the trial court sentenced Padillow to life imprisonment without parole on Count 1, and twenty (20) years imprisonment on Counts 2 and 3. In Case No. CF-2011-3957, the trial court sentenced Padillow to twenty (20) years imprisonment on Count 1, and life imprisonment without the possibility of parole on Count 2. The trial court ordered the sentences to run consecutively. Dkt. 17-19.

Padillow, with assistance of counsel, filed a direct appeal to the Oklahoma Criminal Court of Appeals ("OCCA") (Dkt. 16-1), raising the following errors:

I.      Padillow's convictions must be reversed because his removal from the courtroom during the trial violated his constitutional right to be present;

II.     Padillow's convictions must be reversed because his removal from the courtroom during the trial violated his constitutional right to testify on his own behalf;

III.    The trial court erred in finding Padillow to be in direct contempt of court without providing him an opportunity to be heard; and

IV.     The judgment and sentence documents contain errors that do not conform to the sentences returned by the jury and orally pronounced by the court at trial.

The OCCA denied propositions I and II, and granted propositions III and IV, reversing the trial court's judgment and sentence for contempt of court (Proposition III) and ordering the errors in the record be corrected (Proposition IV).   Dkt. 16-3.

On March 7, 2016, Padillow filed a *pro se* application for post-conviction relief in the trial court.  Dkt. 16-4.  Padillow raised the following issues:

I.      Padillow's appellate counsel did not raise issues Padillow suggested;

II.     Padillow's trial counsel erred in failing to thoroughly cross-examine the lab technician, a witness for the State;

III.    Padillow's trial counsel erred in failing to investigate the availability of a video recording of the victim's sexual assault nurse examination ("SANE");

IV.     Padillow's trial counsel erred in failing to call Dr. Baxter as a rebuttal witness;

V.      Padillow's trial counsel erred in failing to question witness Denise Padillow about being coerced by the State of Oklahoma to testify;

VI.     Padillow's trial counsel erred in failing to find defense witness Regina Johnson;

VII.    The trial court erred in denying Padillow's motion to dismiss defense counsel;

VIII.   The jury's finding of guilt in case No. 2011-3957 was not supported by sufficient evidence.

IX.    Padillow's trial counsel was ineffective in failing to request that "crucial evidence" be thrown out.

Dkt. 16-4.

The trial court denied Padillow's application for post-conviction relief ("PCR") on August 14, 2017.  The trial court found no merit to Padillow's claim that he received ineffective assistance of appellate counsel.  As to Padillow's remaining PCR claims, the trial court found they were all procedurally barred because Padillow did not raise them on direct appeal.  The trial court denied Padillow's request for a hearing on the application for PCR and denied his request for appointment of counsel.  Dkt. 16-5.

Padillow filed a *pro se* appeal of the trial court's denial of the application for post-conviction relief.  The OCCA affirmed the denial on December 8, 2017.  Dkt. 16-7.  The OCCA affirmed the trial court's denial of Padillow's ineffective assistance of appellate counsel claim.  Relying on the two-pronged inquiry of *Strickland v. Washington*, 466 U.S. 668 (1984), the OCCA found that Padillow had made no showing of either deficient performance or resulting prejudice by appellate counsel and therefore did not demonstrate a reasonable probability that the outcome of his appeal would have been different.

> None of Petitioner's allegations of deficient performance actually demonstrate objectively unreasonable conduct on the part of his appellate counsel. Moreover, Petitioner offers nothing, such as new evidence, which actually refutes or contradicts the evidence presented at his trial, or which meets his burden of establishing that any of the errors allegedly committed by appellate counsel would have changed the result of his appeal.

*Id.* at p. 3.  The OCCA thus affirmed the trial court's denial of Padillow's application for post-conviction relief in its entirety.  *Id.*

6

### STANDARD OF REVIEW

Under 28 U.S.C. § 2254, federal district courts have jurisdiction to hear claims from state prisoners that their convictions were obtained in violation of the United States Constitution. A petition for writ of habeas corpus will be granted only if the state court's adjudication of the claim:

    (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

    (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A habeas court will first analyze whether federal law "was clearly established by the Supreme Court at the time of the state court judgment." *Byrd v. Workman*, 645 F.3d 1159, 1165 (10th Cir. 2011). A state court's judgment is "contrary to" federal law where "the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Court has on a set of materially indistinguishable facts." *Id.* (citing *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004)). An unreasonable application of federal law occurs where the state court identifies the proper controlling legal principle but "unreasonably applies" the law to the facts of the defendant's case. *Id.* A state court's determination must be more than "merely wrong" or "clear error." *Shinn v. Kayer*, 141 S.Ct. 517, 523 (2020) (quoting *Virginia v. LeBlanc*, 137 S.Ct. 1726, 1728 (2017) (*per curiam*)). A habeas petitioner must demonstrate that the state court's decision "is so obviously wrong that its error lies 'beyond any possibility for fairminded disagreement.'" *Shinn*, 141 S.Ct. at 523 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).

Exhaustion is a threshold issue in a habeas case. Under the federal statute, a habeas petitioner "shall not be deemed to have exhausted the remedies available in the courts of the State

. . . if he has the right under the law of the State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).  The doctrine serves to avoid a federal court's involvement in overturning a state court conviction before the state has an opportunity to address and correct a constitutional violation.  *See Davila v. Davis*, 137 S.Ct. 2058, 2064 (2017).  A habeas petitioner must "give state courts a fair opportunity to act on their claims."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (citing *Castille v. Peoples*, 489 U.S. 346, 351 (1989)).  This requires that a prisoner give the state court "a full opportunity to resolve constitutional issues by invoking one complete round of the State's established appellate review process."  *O'Sullivan*, 526 U.S. at 845.  A prisoner must "fairly present" each claim raised in a petition for writ of habeas corpus to the courts in the state of conviction.  State courts are first granted the opportunity to "correct alleged violations" of constitutional magnitude before those claims may be heard in federal court.  *Duncan v. Henry*, 513 U.S. 364, 365-366 (1995) (per curiam).  The purpose of habeas review is to "guard against extreme malfunctions in the state criminal justice systems" not as "a substitute for ordinary error correction" through appeal in state court.  *Harrington v. Richter*, 562 U.S. 86, 102 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n. 5 (1979) (Stevens, J., concurring in judgment)).

### PROCEDURAL DEFAULT

The doctrine of procedural default is an "important corollary" to the doctrine of exhaustion. *Davila*, 137 S.Ct. at 2064.  Both doctrines serve to advance the interests of comity, finality, and federalism.  *Id.*

> "Just as in those cases in which a state prisoner fails to exhaust state remedies, a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address" the merits of "those claims in the first instance."

*Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 731-32 (1991)).

Federal courts sitting in habeas will not review federal claims decided by a state court on procedural grounds "if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  *Coleman*, 501 U.S. at 729.  In application, the "independent and adequate state law ground" doctrine bars a federal court from addressing a prisoner's federal claims on the merits when "the prisoner has failed to meet a state procedural requirement."  *Id.* at 730.  A state procedural default is "independent" when it relies on state, not federal law.  *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008) (citing *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998)).  A state procedural default is "adequate" if it is "firmly established and regularly followed."  *Smith*, 550 F.3d at 1274 (citing *Clayton v. Gibson*, 199 F.3d 1162, 1171 (10th Cir. 1999)).

### A.  Padillow's Habeas Grounds II, III, IV, and V are Procedurally Defaulted.

Padillow did not raise Grounds II, III, and V (ineffective assistance of trial counsel) or IV (trial court error in denying motion to dismiss counsel) on direct appeal.  He raised them in his application for post-conviction relief, but the trial court denied each of the four claims because Padillow did not raise them on direct appeal, and under Oklahoma law they were thus "waived." On appeal of the denial of post-conviction relief, the OCCA affirmed that the claims were waived and procedurally barred.

A court sitting in habeas will not address claims that were procedurally defaulted in state court on an "independent and adequate" state procedural ground unless the habeas petitioner can demonstrate cause and resulting prejudice for the default or a fundamental miscarriage of justice. *Harmon*, 936 F.3d at 1060 (quoting *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998)).  In *Smith v. Workman*, the Tenth Circuit determined that a habeas petitioner's waiver of claims not raised on direct appeal is an "independent and adequate" basis for a habeas court to bar review *of*

*any claim except ineffective assistance of trial counsel.*  550 F.3d at 1274 (emphasis added); *see also Cannon v. Gibson*, 259 F.3d 1253, 1267-69 (10th Cir. 2001).

In Oklahoma, a criminal defendant is required to raise ineffective assistance of trial counsel claims on direct appeal.  If the defendant fails to do so, the claims are waived.  *Harmon v. Sharp*, 936 F.3d 1044, 1060 (10th Cir. 2019) (citing *Sporn v. Oklahoma*, 139 P.3d 953, 953-54 (Okla. Crim. App. 2006)).  Federal courts are required to undertake a more thorough "adequacy" analysis when the claim involves ineffective assistance of counsel because of the potential that dismissal of a procedurally defaulted claim could infringe on a defendant's Sixth Amendment right to counsel.  *See Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008); *Fairchild v. Workman*, 579 F.3d 1134, 1142 (10th Cir. 2009) (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 378 (1986)) ("Because collateral review will frequently be the only means through which an accused can effectuate the right to counsel, restricting the litigation of some Sixth Amendment Claims to trial and direct review would seriously interfere with an accused right to effective representation.").  Thus, claims of ineffective assistance of trial counsel not raised on direct appeal are waived only when (1) trial counsel and appellate counsel are different, and (2) "the ineffectiveness claim can be resolved upon the trial record alone."  *English v. Cody*, 146 F.3d  1257, 1264 (10th Cir. 1998).  *See also Harmon*, 936 F.3d at 1061 (citing *Cuesta-Rodriguez v. Carpenter*, 916 F.3d 885, 901 (10th Cir. 2019) (other citations omitted)).

Here, Padillow's attorneys at trial were private counsel retained by the court as conflict counsel.  Padillow's appellate attorney was appointed by the OIDS.  Thus, trial and appellate counsel were separate, meeting the first requirement of the adequacy analysis.  As to the second requirement, this Court finds that the issues raised can be dealt with on the trial record alone without any additional fact finding because an adequate trial record exists as to each of the

defaulted claims.  Having determined that the procedures afforded to Padillow in the trial court do not require additional fact finding, the "adequacy" requirement is met.  Accordingly, the state court's procedural bar of Padillow's ineffective assistance of trial counsel claims and his claim of trial court error is both independent and adequate to support this Court's finding of procedural default.  Thus, Padillow's habeas grounds II, III, IV, and V are procedurally defaulted and will not be considered on the merits.

### B. **Padillow cannot overcome the procedural bar.**

Having determined that the Oklahoma "waiver" of claims not addressed on direct appeal is both independent and adequate, there is only one other narrow avenue available to Padillow to pursue review of the merits of his defaulted claims.  To overcome the procedural default Padillow must demonstrate "cause for the default and actual prejudice as a result," *Coleman*, 501 U.S. at 750, or demonstrate that a failure to consider his claims "will result in a fundamental miscarriage of justice."  To demonstrate cause, a petitioner must show "an objective factor external to the defense" prevented compliance with the state's procedural rule.  This occurs when the failure to comply "cannot fairly be attributed" to the prisoner.  *Davila*, 137 S.Ct. at 2065.  Cause alone is insufficient, however.  A petitioner must also demonstrate prejudice resulting from the default. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 485 (1986).

The fundamental miscarriage of justice exception requires a showing of "actual innocence" which the high court defines as a showing "that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt."  *Schlup v. Delo*, 513 U.S. 298, 327-28 (1995).  This showing requires "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial."  *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup*, 513 U.S. at 324).  A

11

showing of "actual innocence" is exceedingly rare and "permits review only in the 'extraordinary' case." *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327).  The high court has held that actual innocence "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623-24 (1998).

Padillow has put forward no specific factual allegations as cause for the default.  Having thoroughly reviewed the extensive trial record in the case, the Court can fathom no potential arguments that would support a showing of cause for the default.  Thus, Padillow has not demonstrated cause for the procedural default or any resulting prejudice, nor has he met the high bar of proving factual innocence required to show a fundamental miscarriage of justice.  Accordingly, the Court finds Grounds II, III, IV, and V are procedurally defaulted.  The Court will not address them on their merits.

DISCUSSION AND ANALYSIS OF THE MERITS OF PADILLOW'S HABEAS CLAIMS

### A. <u>Habeas Ground I:  Padillow received constitutionally effective assistance of appellate counsel.</u>

Padillow claims that he sent to his attorney and filed with the trial court a letter outlining eight defenses he "deemed necessary to complete a thorough direct appeal." Dkt. 1, p. 3.  Padillow argues that his attorney should have raised these issues on appeal because they were "much stronger grounds" than those raised by appellate counsel.  *Id.*  Padillow speculates that had his attorney followed his directions, "the outcome of the appeal would have been favorable to Petitioner instead of simply being affirmed."  *Id.*  Padillow properly raised the ineffective assistance of counsel claim for the first time in his application for post-conviction relief and raised the trial court's denial of his claim in his appeal to the OCCA.  Accordingly, Padillow fully exhausted the claim, and this Court will address it on its merits.

12

A habeas court reviews ineffective assistance of appellate counsel claims under *Strickland v. Washington*, 466 U.S. 668 (1984). *See Smith v. Robbins*, 528 U.S. 259, 285 (2000) (holding that proper standard for evaluating claims of ineffective assistance of appellate counsel is that announced in *Strickland*). To succeed on a claim that appellate counsel was unconstitutionally ineffective, a defendant must demonstrate his attorney "unreasonably failed to discover nonfrivolous issues and to file a merits brief raising them." *Robbins*, 528 U.S. at 285. In addition to demonstrating appellate counsel's objective failure, a defendant must also show that he was prejudiced by counsel's errors, meaning he must demonstrate that had counsel not erred, he "would have prevailed on appeal." *Id.* at 285-86. *See also Milton v. Miller*, 744 F.3d 660, 669 (10th Cir. 2014). "[A]n ineffective assistance of appellate counsel claim lacks merit if the petitioner argues that appellate counsel should have asserted *meritless* ineffective assistance of trial counsel claims." *Harmon v. Sharp*, 936 F.3d 1044, 1063 (10th Cir. 2019) (citing *Ryder ex rel. Ryder v. Warrior*, 810 F.3d 724, 746-47 (10th Cir. 2016)). On habeas review, a court faced with claims that appellate counsel was ineffective for failing to raise a claim on direct appeal must determine whether the omitted issue has merit. "If the omitted issue is meritless, then counsel's failure to raise it does not amount to constitutionally ineffective assistance." *Hawkins v. Hannigan*, 185 F.3d 1146, 1152 (10th Cir. 1999) (citing *Parker v. Champion*, 148 F.3d 1219, 1221 (10th Cir. 1998) (other citations omitted)).

Appellate counsel is not required to raise every potential cognizable issue to provide constitutionally effective assistance. A defendant does not have a "constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." *Jones v. Barnes*, 463 U.S. 745, 751 (1983). The Supreme Court recognizes that an effective appellate attorney "winnow[s] out weaker

arguments on appeal and focus[es] on one central issue if possible, or at most only a few key issues," and cautions that "a brief that raises every colorable issue runs the risk of burying good arguments." *Id.* at 751-52. To require appellate counsel to "raise every 'colorable' claim suggested by a client would disserve the very goal of vigorous and effective advocacy." *Id.* at 754. *See also Smith v. Murray*, 477 U.S. 527, 536 (1986) ("This process of 'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail far from being evidence of incompetence, is the hallmark of effective appellate advocacy."). Appellate counsel "is not required to have a tactical reason—above and beyond a reasonable appraisal of a claim's dismal prospects for success—for recommending that a weak claim be dropped altogether." *Knowles v. Mirzayance*, 556 U.S. 111, 127 (2009).

In his habeas petition, Padillow states that he sent his appellate attorney a letter that included a list of issues Padillow wanted raised on appeal:

1. There was insufficient evidence to support the 2010 charges;

2. The trial court erred in not determining witnesses requested by Padillow were "unavailable;"

3. The trial court wrongfully denied testimony of Regina Johnson;

4. Trial counsel never searched for video of the colposcope by Nurse Valento;

5. Trial counsel did not attempt to find witness Regina Johnson;

6. Trial counsel did not ask questions of witnesses presented to them by Padillow;

7. Trial counsel insisted presenting a defense theory that Padillow deemed "a lie;" and

8. Trial counsel should have withdrawn after he assaulted them and the trial court should have appointed him new counsel or allowed him to represent himself.

Dkt. 1, pp. 24-37. Appellate counsel did not raise any of these issues in the appellate brief. This Court will consider the merits of each of these claims in turn.

14

1.  <u>Sufficient evidence supported the verdict.</u>

A habeas petitioner is entitled to relief for insufficient evidence if "upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). A habeas court should not make its determination based on its own evaluation of the evidence, but whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 319. This inquiry is an objective one, meaning a federal court sitting in habeas may overturn a state court decision rejecting a challenge to the sufficiency of the evidence only where the state court decision was "objectively unreasonable," *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)), or "so insupportable as to fall below the threshold of bare rationality," *Coleman v. Johnson*, 566 U.S. 650, 656 (2012).

The *Jackson* standard "respects the jury's responsibility to weigh the evidence and to draw reasonable inferences from the testimony presented at trial." *Dockins v. Hines*, 374 F.3d 935, 939 (10th Cir. 2004) (quoting *Jackson*, 443 U.S. at 319). Much deference is given to the finder(s) of fact "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. In addition to the deference due the trier of fact, the high court notes that the "nature" of a constitutional sufficiency review by a habeas court is "sharply limited." *Wright v. West*, 505 U.S. 277, 296 (1992). A habeas petitioner claiming insufficient evidence "faces a high hurdle" under the *Jackson* standard. *Patton v. Mullin*, 425 F.3d 788, 796 (10th Cir. 2005).

After a thorough review of the record, this Court finds sufficient evidence, including victim and witness testimony, was presented to the jury to support a guilty verdict in the 2010 case. On

this basis, rational jurors could have found Padillow's guilt beyond a reasonable doubt.  Had this claim been raised by appellate counsel, it would not have supported a different outcome on appeal. Accordingly, this issue was meritless and cannot constitute a basis for an ineffective assistance of appellate counsel claim.

      2.  <u>There was no error in the trial court failing to recall witnesses requested by Padillow.</u>

The witnesses Padillow wanted recalled had been thoroughly cross-examined by defense counsel and appropriate objections raised during their testimony.  *See* Dkt. 17-16, pp. 41-43.  In the interest of judicial economy, it was entirely reasonable for the trial court to deny Padillow's request to recall them.  As such, this claim would have been found lacking on appeal and does not support an ineffective assistance of appellate counsel claim.

      3.  <u>Neither Padillow nor his attorneys could locate Regina Johnson.</u>

Padillow gave his attorneys very limited information regarding the whereabouts of Regina Johnson.  He knew the major cross-streets in her neighborhood, and he knew where she worked, but did not know her address and did not produce a contact telephone number.  Padillow's attorneys were unable to locate her.  During the time that Padillow was acting without counsel, he did not attempt to find her himself.  As a result, she was never located.

Padillow claims that she came to his house on the day of the offense in the 2011 case and would testify that Padillow was alone with the minor victim for only a limited amount of time. Padillow's statements regarding Johnson's testimony are merely speculative.  He offers no proof of how her statements would have exonerated him.  Moreover, her testimony would not have fit with trial counsel's theory of the case and could have caused jury confusion.  The trial judge's denial of assistance in finding Johnson would not have led to a different result on appeal.

      4.  <u>Decisions of trial strategy do not support constitutionally ineffective assistance of counsel claims.</u>

On their faces, issues four through eight are not the type of error that demonstrate objectively unreasonable choices by trial counsel.  In fact, each issue falls within the purview of "trial strategy" and do not support constitutionally ineffective assistance.  As mere matters of trial strategy, none of these issues would have prevailed on appeal.

An additional word about the SANE video and Nurse Valento's testimony is in order. Padillow's trial attorneys raised the inconsistencies between Nurse Valento's written report and the physical evidence in the sealed and maintained rape kit.  Padillow's attorneys cross-examined Valento as to these inconsistencies in an attempt to impeach her testimony.  This is the exact type of trial strategy question that cannot constitute ineffective assistance under *Strickland*.  The video, which was a video of the medical procedure, not of the entire physical examination, would have been cumulative of the impeached testimony.  Had Padillow's counsel raised this issue on appeal, it would have been found meritless.

This Court has thoroughly reviewed the entire trial transcript and finds no objective error by Padillow's appellate counsel.  Thus, he has not demonstrated that had those errors been raised the outcome of his appeal would have been different.  The OCCA identified the correct Supreme Court standard of *Strickland* and determined there was no merit to Padillow's ineffective assistance of appellate counsel claim.  Therefore, the OCCA's ruling was neither contrary to or an unreasonable application of controlling Supreme Court precedent.  As such, Padillow's Ground I is **DENIED**.

**B.   Habeas Ground VI:  The trial court's denial of Padillow's request for an evidentiary hearing is not cognizable on habeas review.**

Padillow argues that the trial court should have held an evidentiary hearing on his petition for post-conviction relief.  There is no constitutional requirement that states provide a criminal

defendant with any form of collateral review. *Pennsylvania v. Finley*, 481 U.S. 551, 556-57 (1987). Padillow's claim that he should have received an evidentiary hearing by the trial court in his post-conviction proceeding is not a matter of constitutional dimension. *See Sellers v. Ward*, 135 F.3d 1333, 1339 (10th Cir. 1998). His claim focuses "only on the [State of Oklahoma's] post-conviction remedy and not the judgment which provides the basis for his incarceration, it states no cognizable federal habeas claim." *Sellers*, 135 F.3d at 1339 (citing *Montgomery v. Meloy*, 90 F3d 1200 (7th Cir. 1996)). It is well-settled federal law that habeas relief is not available for errors of state law. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."). In reviewing a federal habeas petition, the Court is "limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *McGuire*, 502 U.S. at 68; *see also Montez v. McKinna*, 208 F.3d 862, 865 (10th Cir. 2000) ("claims of state law violations are not cognizable in a federal habeas action."). Habeas relief for claims of state-law error are available only when the error "was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Hooks v. Workman*, 689 F.3d 1148, 1180 (10th Cir. 2012) (quoting *Revilla v. Gibson*, 283 F.3d 1203, 1212 (10th Cir. 2002)) (other citations omitted); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("a state court's interpretation of state law . . . binds a federal court sitting in habeas corpus").

The trial court's decision not to hold an evidentiary hearing on Padillow's application for post-conviction relief is not cognizable on habeas review. Accordingly, Padillow's Ground VI is **DENIED**.

C. **Habeas Ground VII:  The OCCA's affirmance of the trial court's removal of Padillow from the courtroom based on his misconduct was not contrary to or an unreasonable application of relevant Supreme Court law.**

18

Padillow claims that his removal from the courtroom after he physically assaulted his attorneys violated the confrontation clause of the Sixth Amendment. The Sixth Amendment guarantees a criminal defendant the right to be confronted with the witnesses against him. It is now well-settled that this right also guarantees a criminal defendant's right to be present at every stage of the trial against him. *See Snyder v. Massachusetts,* 422 U.S. 806 (1934); *Lewis v. Untied States*, 146 U.S. 370 (1892). The right, however, is not absolute. A criminal defendant may lose his right to be present at his trial through his own misconduct, that is "if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom." *Illinois v. Allen*, 397 U.S. 337, 343 (1970). Utmost in the Supreme Court's reasoning was the concern that a criminal defendant, by his extreme misbehavior, cannot be allowed to manipulate the proceedings.

> [O]ur courts, palladiums of liberty as they are, cannot be treated disrespectfully with impunity. Nor can the accused be permitted by his disruptive conduct indefinitely to avoid being tried on the charges brought against him. It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes.

*Id*. at 346. *See also United States v. Nunez*, 877 F.2d 1475, 1478 (10th Cir. 1989) (quoting *United States v. Lawrence*, 605 F.2d 1321, 1325 (4th Cir. 1979)) ("A court should, of course, vigilantly protect a defendant's constitutional rights, but it was never intended that any of these rights be used as a ploy to frustrate the orderly procedures of a court in the administration of justice."). A trial court is given vast discretion to conduct and maintain control of the courtroom. "[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case." *Allen.* 197 U.S. at 343. Moreover, "the exclusion of a defendant from a trial proceeding should be considered in light of the whole record."

19

*United States v. Gagnon*, 470 U.S. 522, 526-27 (1985).  *See also United States v. Munn*, 507 F.2d 563, 568 (10th Cir. 1974).

To properly consider this and the following ground for habeas relief, the Court must undertake a thorough review of the record of the state court proceedings in the case.  The record shows that the trial court assigned four attorneys from the Tulsa County public defender's office, sequentially, to Padillow's case.  Each attorney either withdrew due to conflicts with Padillow or Padillow asked that they be removed because he disagreed with them.  As a result, the trial court resorted to appointing conflict counsel, Mr. Lee and Mr. Cagle, to represent Padillow.  The court held a closed hearing on September 17, 2013, to discern how trial preparation was proceeding with newly-appointed conflict counsel.  Padillow expressed dissatisfaction with Lee and Cagle:

> I believe right now it would be safe to say that the communication between me and my attorneys have really come to a halt.  They are insisting that I have no say-so in my defense and I would believe that I do have some say-so in what witnesses that should be presented, some questions that should be asked, what evidence that should be presented, things of this nature.  I don't just—I just don't feel like it's right for me not to have any type of say-so in my defense.

Dkt. 17-4, p. 5.

Padillow disagreed with the strategy Lee and Cagle planned to take at trial, which was to argue (1) the DNA found on the child victim could have transferred some way other than sexual contact, (2) the DNA evidence could have come from a male relative of Padillow's who would have the same DNA profile, (3) Nurse Valento's recordkeeping was not consistent with the physical evidence, and (4) the victims, who are all related, could have conferred in an attempt to frame Padillow.   Defense counsel informed the court at the hearing that defendant wanted to proceed on a theory that had no evidentiary basis.  Specifically, a theory that the child victim took a condom from the trash at Padillow's house and rubbed it on herself to transfer defendant's DNA

to her vulva.  Defense counsel stated their belief that they could not ethically present this defense, and even so, there was no evidence to support this theory.  Dkt. 17-4, pp. 6-15.

Mr. Lee also informed the court of an incident that occurred at a pretrial meeting with Padillow at the jail:

> [D]uring the meeting, at the end of the meeting, we were still in the middle of it, we did cut the meeting short.  Mr. Padillow proceeded to–and excuse my language– call us motherfuckers.  At that point, I said that the interview was done.  As we got up to leave, Mr. Padillow tried to tell us to sit back down, at which point I told him that it was not going to happen.  And as we were walking out, Mr. Padillow threatened both me and Mr. Cagle that he would knock our punk asses out and proceeded to hurl some racial slurs, including cracker and peckerwood at us.  That's why the meeting concluded in about an hour and 15 minutes.

Dkt. 17-4, pp. 12-13.  At the conclusion of this hearing, Padillow asked to proceed *pro se*.  Dkt. 17-5, p. 7.

On October 3, 2013, two months before trial, the trial court held a hearing pursuant to *Faretta v. California*, 422 U.S. 806 (1975), to determine whether Padillow would proceed without counsel and whether the waiver of his right to counsel was knowing and voluntary.  At the close of the *Faretta* hearing, after the trial court had discussed with him the risks of self-representation, Padillow decided he would proceed with conflict counsel.  Dkt. 17-6.

The trial court held another hearing regarding counsel on November 1, 2013, after Padillow had contacted the court requesting new counsel.  The following occurred:

> Court:  Mr. Padillow has sent me letters and now filed a motion and he is requesting, at least in the Court's mind, what he is always requesting and that is he can't get along with his lawyer and he wants other lawyers.  He wants me to throw Cagle and Lee out of the case.  He wants me to get other lawyers.  I've gone through, really, the entire Public Defender's Office.  I ended up recusing the entire Public Defender's Office out of the case because Mr. Padillow requested I do that after he had run-ins with multiple public defenders.  I have tried over and over to get an attorney in the case that Mr. Padillow can work with and I've been unsuccessful.
>
> I've wasted hours of hearings conveying to Mr. Padillow the best I could articulate the pitfalls and dangers of representing himself.  We went over that at length.  I set

21

up interviews with him and his attorneys, Mr. Cagle and Mr. Lee. Those interviews, unfortunately, were abruptly ended when Mr. Padillow started to use threatening assaultive language with them. We had more hearings. He apologized for his behavior on the record to the attorneys.

We had more hearings. He agreed with me that it would be really dangerous to represent himself and he wanted counsel. I organized with the jail the ability for him to have time in the law library. He agreed to keep counsel. They have had meetings past then and I've now received letters that he doesn't communicate well with them. Off the record, I asked what he wants to do. He says he wants to go it alone.

Are you wanting to represent yourself, Mr. Padillow?

Defendant: Yes, sir.

Court: I'll allow it. Mr. Lee, you're standby counsel. I will keep you and Mr. Cagle in the case as standby counsel.

Dkt. 17-8, pp. 2-3.

The trial began on December 3, 2013. Padillow got as far as voir dire before he requested of the court that his standby counsel be reappointed to represent him for the rest of the trial. The trial court granted that request. Attorneys Lee and Cagle conducted the rest of voir dire and cross-examined all witnesses in the State's case. The State rested. The defense presented one witness by telephone, Marsha Padillow, then the court took a recess for lunch and preparation for Padillow's testimony. Upon returning to court, Padillow made a statement to the court, outside the hearing of the jury, that his attorneys would not allow him to present evidence he wanted to present, namely recalling three witnesses who had already testified and been cross-examined and an additional witness that his attorneys did not call. The trial court denied Padillow's requests for recalling or adding witnesses. Defense lawyers then called Mr. Padillow to testify. Instead of approaching the witness stand, Padillow physically attacked Mr. Cagle. Dkt. 17-16, pp. 40-44.

After the incident, the Court made the following record:

Court: We're back on the record. Please be seated. I've excused the jury from the room.

I wanted to make a more full and complete record outside the presence of the jury. Mr. Padillow very aggressively and violently attacked Mr. Cagle.

He was called to testify. He stood up with no problem. He acted like he was getting ready to walk to the stand and right as he did he jumped full force into Mr. Cagle, who was sitting in a chair right behind where Mr. Padillow was.

The violent attack broke my furniture. I have chairs now without legs. The jury witnessed it.

The deputies jumped on Mr. Padillow during the attack and in the process Mr. Lee also jumped on Mr. Padillow to separate him from Mr. Cagle.

Mr. Lee and/or the deputies were able to separate the defendant from attacking his attorney, Mr. Cagle.

The deputies removed Mr. Padillow through the side entrance, not the main hallway entrance, but the side entrance to keep him away from the jury and to get him out as quickly as possible.

To state for the record, it will just be a cold record on appeal, to say that this had no impact on the jury would be ridiculous.

It is my assessment having watched the incident and watched the jury that its affect will not impact this trial.

The jury did not become emotional. There were no tears shed. There were no even gasps. They just witnessed what happened in front of them, but there were no emotional disturbances viewed by the Court of the jury in any way.

I do not believe that what just happened should cause a mistrial and I will not mistry it.

In front of the jury I said that it was my impression that his conduct was a knowing waiver of his right to testify. The defense has announced they have no more witnesses to call.

. . .

We are outside the presence of the jury for the purpose of the jury instruction conference. Mr. Padillow is not present based upon his willful, aggressive attack on counsel. I have deemed that as a knowing and voluntary waiver of his right to testify and, also he has absented himself knowingly from the rest of these proceedings.

The jury is not present and I have discussed with counsel my thoughts now that I've had a chance to take a break and think about this.

> It could be argued that there is a conflict now that he attacked counsel Mr. Cagle. I will not mistry the case and I do not believe that conflict warrants a mistrial. He created the conflict and he will not benefit from a conflict that he knowingly created on his own.
>
> …
>
> And I don't want to belabor the record, but what should be obvious at this point is that this was just the climax of what he's been doing and that is that he would threaten something and, then, when it comes to it not go forward.
>
> He wants to represent himself, he changes his mind. Wants to do this, changes his mind. Wants to testify, changes his mind.

Dkt. 17-16, p. 49-50.

With Mr. Padillow absent, Mr. Lee went on to make closing arguments (the defense had no other witnesses to present after Mr. Padillow himself), as did the State of Oklahoma. The matter was given to the jury who returned with guilty verdicts on all counts. Padillow was present for sentencing. In case CF 2010-3621, on count 1, first degree rape, the trial court sentenced Padillow to life without parole; on count 2, rape by instrumentation of a child, the trial court sentenced Padillow to 20 years imprisonment; and on count 3, rape by instrumentation, the trial court sentenced Padillow to 20 years imprisonment. In case CF 2011-3957, on count 1, first degree rape, the trial court sentenced Padillow to 20 years imprisonment, and on count 2, first degree rape, the trial court sentenced Padillow to life without parole. All sentences were ordered to run consecutively. The court also found Padillow guilty of contempt based on his conduct in the courtroom. He sentenced Padillow to six months in the Tulsa County Jail, to be served at the end of his sentences in the Department of Corrections. Dkt. 17-19.

The OCCA, citing *Allen* and its progeny, acknowledged Padillow's right to be present during all stages of his trial, and the restrictions upon that right for misconduct. Dkt. 16-3, pp. 5-8. Reviewing for abuse of discretion, the OCCA found no error in Padillow's removal or the trial court's finding that Padillow's actions in attacking his attorneys in the courtroom constituted a

waiver of his right to be present.  The OCCA stated, "Padillow's decision to violently attack defense counsel, rather than testify, constituted a voluntary absence and waiver of his right to be present." *Id.* at 8.  The OCCA further reasoned that the court's failure to give Padillow a chance to return on a promise of good behavior was harmless error.

> Padillow fails to show how his presence would have aided his defense, and the record supports our finding (and the trial court's conclusion) that, beyond a reasonable doubt, his absences for arguments, second stage and the verdict returns did not affect the verdict.  We cannot agree with Padillow's claim that he should be allowed to benefit from his calculated disruptive behavior.

*Id.*

As is clear from the above recitation of procedural facts, Padillow was a difficult client. He could not agree with his attorneys, even after the court assigned him as many as it could.  In working with counsel, Padillow exhibited a pattern of obstinance in the face of any suggested advice with which he did not agree.  When counsel encouraged him to take a different course of action, he became belligerent, shouting obscenities and ultimately physically attacking his attorneys.

The relevant law allows the trial court a great deal of latitude to deal with a defendant's misconduct in the courtroom.  It goes without saying that even difficult defendants are still due the full panoply of rights afforded under the Constitution.  In reviewing the record, this Court believes that the trial court and trial counsel treated Padillow respectfully and fairly, and successfully ensured his rights were not violated.  The trial judge bent over backwards to ensure that Padillow understood what happened at every step of the trial process and had everything he needed at the points in the litigation where he was proceeding *pro se*.  The trial judge arranged for additional time in the law library and gave Padillow supplies with which to conduct the litigation.

On the issue of counsel, the trial court was extremely patient with Padillow's wavering. Padillow requested counsel represent him at voir dire, through cross-examining the state's witnesses (and making appropriate objections), and procuring the testimony by phone of Marsha Padillow.   Then, when the time came to present the defense case, Padillow sought to proceed without attorneys so that he could present the evidence he wanted to present.   This timeline suggests manipulation.  Padillow wanted the attorneys when he needed their expertise but wanted to toss them aside when they wouldn't agree to the presentation of what they believed to be an unethical defense.   And ultimately, after a final disagreement regarding his own testimony, he physically attacked his attorneys.

Based on the *Allen* line of cases, the trial judge possessed vast discretion to control the courtroom as he saw fit.  The judge worked over months with Padillow to ensure he was able to proceed on his own if he so chose.   The trial judge was patient, fair, and perpetually aware of Padillow's constitutional rights, even in the face of Padillow's consistent mistreatment of attorneys and equally consistent wavering between wanting to proceed with counsel and wanting to go it alone.

Given the vast discretion accorded to a trial judge to conduct his courtroom, coupled with the extensive record demonstrating Padillow's mistreatment of attorneys, attempts to manipulate them and the court, aggressive behavior, and a physical attack during trial, this Court cannot find that the OCCA's findings were contrary to or an unreasonable application of relevant Supreme Court law.  The OCCA found that Padillow should not be allowed to benefit from his calculated disruptive behavior.  In *Allen*, courtroom control and prevention of manipulation of the judicial process were the rationale behind the holding that a criminal defendant, by his own behavior, could lose his right to be present at his own trial.

It is significant that Padillow was present during multiple pre-trial hearings and conferences; he was present for voir dire and for the presentation of the entire State's case. He was present in the courtroom during the telephonic testimony of the defense's one witness. He was the last witness in the defense's case. After the attack and his subsequent removal, his attorney Mr. Lee made compelling and thorough closing argument. Padillow was present for sentencing. As to Padillow's point that he was not warned he would be removed from the courtroom as contemplated in *Allen*, this Court cannot see how any type of warning could have led to any additional constitutional process. Padillow had been told many times by the trial judge not to interrupt or speak over others. Padillow had been in and out of the trial judge's courtroom for hearings and conferences for a year prior to trial. Padillow was fully aware of the behavior expected of him. That he was not told specifically, "don't physically attack your attorney or you will be removed from the courtroom" was not required. In *Allen*, the Supreme Court emphasized that a defendant may be removed if after warning, he thereafter persists in "conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom. " 397 U.S. at 343.

The trial court and trial counsel attempted to preserve Padillow's rights fully and fairly, despite his misconduct. The OCCA's holdings that Padillow's own conduct caused his removal from the courtroom and did not violate his Sixth Amendment right to be present are not contrary to or an unreasonable application of relevant federal law. Accordingly, Ground VII is **DENIED**.

D. **Ground VIII: The OCCA's finding that Padillow's physical attack of his attorney constituted a waiver of his right to testify is not contrary to or an unreasonable application of applicable Supreme Court precedent.**

Under the Fifth Amendment a criminal defendant cannot be compelled to testify against himself. The converse is also true. "Every criminal defendant has the constitutional right to testify

at trial and the ultimate decision of whether or not to testify belongs solely to the defendant." *Cannon v. Trammel*, 796 F.3d 1256, 1270 (10th Cir. 2015) (citing *Jones v. Barnes*, 463 U.S. 745, 751 (1983)).  The right to present one's defense is not unlimited, however.  "[I]n appropriate cases, [the right] may bow to accommodate other legitimate interests in the criminal trial process." *Rock v. Arkansas*, 483 U.S. 44, 55 (1987).  Restrictions on a defendant's right to testify, however, "may not be arbitrary or disproportionate to the purposes they are designed to serve." *Id.* at 55-56.  Like the right to be present, the right to testify may be waived by "contumacious conduct." *Nunez*, 877 F.2d at 1478.  Other federal courts of appeal have reached the same conclusion.  *See United States v. Evans*, 908 F.3d 346, 355 (8th Cir. 2018); *United States v. Ives*, 504 F.2d 935 (9th Cir. 1974) (holding that whether seriousness of defendant's misconduct constitutes waiver is within trial judge's discretion).

The OCCA determined that Padillow's action of attacking his attorney on his way to taking the stand demonstrated "Padillow was aware of his right to testify and was acting on it when he changed direction and chose to create a violent disruption."  The OCCA further held, "[t]his act supports that trial court's conclusion that Padillow decided to waive his right to testify."  Dkt. 16-3, pp. 8-10.

Like the right to be present in the courtroom, discussed in Ground VII, supra, the right to testify on one's behalf is not absolute.  It can be waived by misconduct.  A trial court has vast discretion in determining whether a defendant's misconduct was so serious as to constitute waiver of the right to testify.  Statements from Padillow's counsel and Padillow himself demonstrated that they could not agree on the tactical approach to take regarding Padillow's testimony.  Padillow insisted on making a speculative argument with no basis in evidence.  Padillow's counsel had informed the trial court they did not believe they could ethically present such a defense.  The events

28

in the moments leading up to the physical attack demonstrate Padillow's calculated effort to get his case presented in the way that he wanted, even if it resulted in violence.  He did not give the court or his attorneys the respect they patiently gave him.  It was within the court's discretion to find that Padillow's attack constituted waiver of his right to testify.  Thus, the OCCA's determination that there was no error in the trial court's finding of waiver was not contrary to or an unreasonable application of relevant Supreme Court precedent.  Accordingly, Padillow's Ground VII is **DENIED**.

### CONCLUSION

In summary, Petitioner has not shown that he is in custody in violation of the Constitution. The Court therefore denies the Petition for Writ of Habeas Corpus.  Further, because petitioner has not shown that reasonable jurists would debate this Court's assessment of his constitutional claims or its determination that some of his claims are procedurally barred, the Court DENIES a certificate of appealability.

**ACCORDINGLY, IT IS HEREBY ORDERED** that:

1.  The petition for writ of habeas corpus (Dkt. 1) is **DENIED**.

2.  A certificate of appealability is **DENIED**.

3.  A separate judgment shall be entered in this matter.

DATED this 24th day of March 2021.

TERENCE C. KERN
United States District Judge

29